JEHOVAH'S WITNESSES ASSEMBLY HALLS OF NEW JERSEY, INC. and Watchtower Bible and Tract Society of New York, Inc., Plaintiffs,

v.

CITY OF JERSEY CITY, a Municipal Corporation; Gerald McCann, Individually and as Mayor of the City of Jersey City; Mark T. Munley, Individually, as Zoning Officer, as Director of the City of Jersey City Department of Housing & Economic Development and as Agent and Employee of the City of Jersey City; Robert R. Shortell, Individually, as Construction Official and as Agent and Employee of the City of Jersey City; Anthony Lambiase, Individually and as Agent and Employee of the City of Jersey City; Michael Regan, Individually and as Agent and Employee of the City of Jersey City; Louis Hampton, Individually and as Agent and Employee of the City of Jersey City; John Doe, a Fictitious Name; and Richard Roe, a Fictitious Name, Defendants.

Civ. A. No. 84–3634.

United States District Court, D. New Jersey.

Oct. 10, 1984.

Krieger, Ferrara, Flynn & Catalina by Harold Krieger, Frank E. Catalina, Jersey City, N.J., William R. Bell, Blackwood, N.J., Leslie R. Long, Brooklyn, N.Y., for plaintiffs.

Joseph Healy, Corp. Counsel by Eugene P. O'Connell, Asst. Corp. Counsel, Law Dept., Jersey City, N.J., for defendant City of Jersey City.

Schumann, Hession, Kennelly & Dorment by Francis DeStefano, Jersey City, N.J., for defendant Gerald McCann.

Edward J. Nowakoski, Bayonne, N.J., for defendants Robert Shortell and Louis Hampton.

Baer & Arbeiter by Benjamin D. Leibowitz, Metuchen, N.J., for defendant Anthony Lambiase.

Deutsch & Mulvaney by Thomas M. DeLuca, Morristown, N.J., for defendant Michael Regan.

DEBEVOISE, District Judge.

## I. The Proceedings.

Plaintiffs are Jehovah's Witnesses Assembly Halls of New Jersey, Inc., a New Jersey nonprofit corporation, referred to as "New Jersey Witnesses" herein, and Watchtower Bible and Tract Society of New York, Inc., a New York nonprofit corporation referred to herein as "Watchtower."

Defendants are Jersey City, its Mayor, Gerald McCann, and various Jersey City officials and employees performing duties relating to zoning, planning and the administration of the zoning, planning and construction ordinances.

Plaintiffs seek preliminary and final injunctive relief, a declaratory judgment and damages. Their basic grievance arises out of the refusal of the City authorities to permit them to repair and renovate the Stanley Theater and ultimately to use it for their religious purposes. Plaintiffs seek preliminary injunctive relief confined to their request to undertake initial repairs and maintenance of the structure, deferring any request for relief relating to their ultimate use of the theater to a later date. A hearing was held on the application for preliminary injunctive relief.

Each side presented witnesses and offered exhibits. The testimony concerned the present condition of the Stanley Theater and the extent to which the New Jersey Witnesses' June 21, 1984 application for permits for repairs and maintenance seeks authorization of electrical and plumbing features going beyond existing equipment and facilities.

## II. The Facts.

Jehovah's Witnesses consider the study of God's word, as contained in the Bible, to be central to their religion. They accept a mandate "of Jehovah to preach and spread the good news of Jehovah's Kingdom with Jesus seated as king." (Plaintiffs' posthearing memorandum at p. 6.)

As part of their religious practices Jehovah's Witnesses meet in homes and as congregations of Witnesses in church-like buildings known as Kingdom Halls. Groups of congregations are known as circuits. These circuits meet periodically in assemblies drawing 3,000 to 4,000 persons. Attendance at circuit assemblies and the conduct of such assemblies is part of the religious practice and discipline of this religious body. Because of the growth of Jehovah's Witnesses in Jersey City, Newark and the New York metropolitan area generally, there is a need to have a facility which can accommodate groups of several thousand persons. Larger national assemblies of Witnesses drawing 150,000 to 250,000 persons are held. Participants in these national assemblies have been quiet, orderly and disciplined.

Besides weekly meetings at their Kingdom Halls, Jehovah's Witnesses regularly attend three larger religious assemblies each year—primarily the circuit assemblies. Circuit assemblies which are two days in duration and are held on weekends to accommodate those who work during the week, are held in theaters, convention halls, arenas and auditoriums year round. A typical circuit assembly program might include musical presentations, live dramatic presentations, slide shows and movies, all of a religious nature. Such features of circuit assemblies, together with the large number of people in attendance, are designed to give Jehovah's Witnesses a sense of brotherhood and unity in their worship.

One of Plaintiffs' primary uses of the Stanley Theater would be to hold circuit assemblies there on weekends throughout the year. Circuits of congregations of Jehovah's Witnesses from the Jersey City/New York City area and environs will attend the circuit assemblies held at the Stanley Theater. The Stanley Theater will also be used for other large gatherings of Jehovah's Witnesses for various special

events throughout the year, including graduation exercises for Jehovah's Witnesses' missionary school and special presentations about Jehovah's Witnesses in foreign countries and the religious work going on there.

The Stanley Theater is located in the Journal Square area of Jersey City, an area which plays an important part in the City's long-range planning.

Pursuant to the requirements of law in the State of New Jersey, the City of Jersey City has had prepared for it a Master Plan Review. This Master Plan Review was completed in January of 1984.

This Master Plan Review specifically addresses commercial development in the Journal Square area. Examples of this in the Review are as follows: At page (iii):

"Marketing studies have been done to encourage private investment in the back office development of Journal Square, including a fiber optics cable, which is being run from Downtown New York through Downtown Jersey City and terminating in Journal Square."

At page 8, the Master Plan Policy recommendations show in the Journal Square area:

"... the creation of a viable mixed-use center through regional offices, additional housing, and preservation of community shopping."

Page 24 of the Review deals specifically with commercial uses. It states that:

"... commercial land uses comprise both retail activities and office activities."

Page 25 of the Review reflects the fact that:

"Journal Square is a key commercial zone of the City of Jersey City."

Page 26 states that:

"... the merchants in the area are experiencing slight slumps in sales which are attributable to the overall recession. Further, the primary office center in Jersey City is Journal Square, which is the center for financial institutions, legal offices and business services. The orientation of these offices is primarily local rather than region-al. However, the recent movement of Citibank computer operations to the PATH Center building, as well as similar proposals by other firms, indicates that the character of the Square's office activities may be changing."

Page 28 of the Master Plan Review shows the volume of existing transportation facilities in the Journal Square area, demonstrated by the chart on page 42. Page 53 further highlights the commercial and office use in the Journal Square area of Jersey City.

In 1968 the Journal Square Bowl Blight Study was approved by the Municipal Council of the City of Jersey City. Pursuant to that blight study, the Journal Square Bowl Redevelopment Plan was adopted by the Municipal Council of the City in July 1974. This redevelopment plan, which encompasses an area directly west of the Stanley Theater, has resulted in the construction of a 50,000 square foot office building completed in 1984.

More recently, in June of 1984, the Journal Square Study Area Blight Report and Journal Square Redevelopment Plan was approved by the Planning Board of the City. This redevelopment plan takes in a portion of Journal Square, which is directly southwest of the Stanley Theater. According to an article in the Jersey Journal, there is a proposed development for this area on which is now located the Loew's Theater and C.H. Martin Department Store. This project contains a 40-story office tower.

Additionally, the City has seen the construction or rehabilitation of several buildings in the Journal Square area; for example, the Port Authority Trans Hudson Transportation Center, which is directly south of the Stanley Theater; the Plaza Hotel conversion into a Senior Citizens' building, completed in 1984; the AIDS Equity office building, completed in 1984, which is located on the southwesterly side of Journal Square; and the rehabilitation of 26 Journal Square, a 16-story office building, which is being rehabilitated with

the benefit of an $800,000 Urban Development Action Grant.

All of these projects have been augmented by a concentrated effort of the various departments of the City. These departments include the Jersey City Redevelopment Agency, the Jersey City Department of Housing and Economic Development, the Jersey City Division of Urban Research and Design, and the Jersey City Economic Development Corporation.

The Stanley Theater was built in 1928, and since its construction it has been used primarily as a movie and vaudeville theater. It is located, as previously stated, in the Journal Square area of Jersey City. Under the present zoning ordinance, adopted after the construction of the theater, the theater is located in an area zoned "C–1 Central Business District."

The purpose of the C–1 Central Business District is set forth in Section 1405 of the Zoning Ordinance to be: "The purpose of this district is to recognize the unique merging of mass transit facilities in Journal Square, the established commercial pattern, and the development intensity. The C–1 District expands the present Journal Square boundaries to encourage higher density residential and commercial uses around the mass transit facilities. It also allows a mixture of uses in high-rise structures, requires off-street loading and requires a reduced level of required off-street parking in view of mass transit services plus parking garages being permitted as a principal use."

Permitted uses include retail sales of goods and services, offices and financial institutions, medium and high-rise apartments, restaurants, hotels, government facilities, recreation and athletic facilities, parking garages and lots and, most significant to this case, theaters and convention halls. Use of the Stanley Theater as a theater or convention hall is thus a permitted use under the Zoning Ordinance.

Houses of worship are not designated as permitted uses, permitted accessory uses or conditional uses in the C–1 zone. Nor are houses of worship permitted in the following zones: C–2 Office and Retail; C–3 Shopping Center; C–4 Finance and Business District; C–5 Neighborhood Commercial revitalization; I–1 Automotive Construction Office; I–2 Intensive Industrial; I–3 Industrial Park.

A house of worship is defined in the ordinance as, "A building for the assembly of members of a designated faith for religious instruction and worship of a diety such as a church, synagogue or temple."

Houses of worship are Permitted Uses in R–1, R–2, R–3 and R–3A residential zones. They are a conditional use in R–4 High Density Residential Zones.

Section 104 of the Zoning Ordinance provides that: "All uses not expressly permitted in any given use district are expressly prohibited in such use district. No structure or addition thereto shall hereafter be built, moved or remodeled, and no land shall hereafter be used, occupied, reoccupied, designed or improved for use or occupancy except for a use that is permitted within the zone in which the structure or land is located."

It is quite clear, therefore, that the Jersey City Zoning Ordinance prohibits houses of worship in C–1 zones and forbids the remodeling of any structure in a C–1 zone for use as a house of worship.

On June 13, 1983, New Jersey Witnesses was incorporated for the purpose of holding title to the Stanley Theater property. On November 9th New Jersey Witnesses purchased the theater property. At the time it was in very poor condition. The roof and plumbing leaked, there was extensive water damage, the electrical wiring was defective, the boiler required replacement. While New Jersey Witnesses has legal title to the theater property, it would appear Watchtower has at least an equitable interest in the premises.

On February 14, 1984, representatives of the New Jersey Witnesses met with representatives of Jersey City's Building and Planning Departments to discuss New Jersey Witnesses' proposed use of the Stanley Theater. The New Jersey Witnesses ex-

plained that they wished to renovate the building and rearrange the seating facilities. It was their intent to continue existing uses such as showing movies and putting dramas on stage. In addition, they planned to install a baptismal pool. The City representatives took the position that the proposed use would convert the theater into a house of worship and would thus violate the Zoning Ordinance.

The New Jersey Witnesses representatives contended that their proposed use was permitted under the theater-convention hall provision of the Zoning Ordinance but that in any event they had a Constitutional right to use the theater in the manner they propose.

On March 2, 1984, New Jersey Witnesses applied to the Jersey City Building Department for a construction permit to renovate the Stanley Theater to be used as a theater and convention hall by Jehovah's Witnesses. The plans which accompanied the application showed extensive remodeling and improvement to the building, but it was still essentially a theater-type facility with the addition of a baptismal pool and several residential apartments.

On April 19, 1984, the zoning officer, Mark T. Munley, denied the application on the ground that "While the district does allow for Convention Halls, the intended use is specifically religious propogation. Religious use such as specified, is allowed in Residentially Zoned Areas of the City."

On May 14, 1984 the New Jersey Witnesses filed an appeal with the Board of Adjustment. A hearing was held on July 19, 1984. At that time zoning officer Munley filed an opinion setting forth his reasons for the denial of the permit. The opinion read as follows:

"The decision of the Zoning Officer of the City of Jersey City denying the request of the Jehovah's Witnesses Assembly Halls of New Jersey Incorporated for a building permanent is a correct and accurate interpretation of the City's Zoning Ordinance.

"The subject property is located within the City's Central Business District (C–1).

Such zoning district does not allow houses of worship as a permitted principal use. The applicant has appealed the Zoning Officer's decision contending that their proposed use is a convention hall and not a house of worship. Convention halls are a permitted use within the C–1 district.

"The Zoning Officer's contention that the proposed use is a religious use qualifying as a House of Worship and not a convention hall is based upon information collected relative to the proposed use. Primary among these are the results of a meeting involving representatives of the Jehovah's Witnesses and representatives of the City of Jersey City. At such meeting the following facts were revealed by the Jehovah's Witnesses representatives:

"1) That the Stanley Theater will be used primarily on weekends as a gathering place for persons from regional Kingdom Halls for religious propogation including prayer, study, and meetings.

"2) That the main level will contain a Baptismal pool as indicated on the submitted building plan.

"3) That although movies and stage productions are foreseen activities, these events will promulgate the Jehovah's Witnesses religion.

"4) That the Jehovah's Witnesses will disseminate their beliefs through written and verbal communication.

"5) That the Jehovah's Witnesses will have available and distribute publications which are religious in nature.

"Furthermore, the Zoning Ordinance of the City of Jersey City defines a house of worship as 'A building for the assembly of members of a designated faith for religious instruction and worship of a diety such as a church, synagogue, or temple.'.

"The title block of the submitted building plan refers to the project as the Jersey City assembly hall and not as a convention hall or theater. The applicant and owner is listed as the Jehovah's Witnesses Assembly Halls of New Jersey, Incorporated.

"A review of such information would indicate the proposed use by the Jehovah's

Witnesses is a house of worship as defined in the Jersey City Zoning Ordinance. There is an obvious inclination toward religion and religious instruction, as well as an obvious assembly of members of a religious organization of which the Jehovah's Witnesses certainly qualify.

"The City of Jersey City given, its zoning ordinance, does allow houses of worship as a permitted principal use within its residential zones; R-1, R-2, R-3 and R-3a districts and as a conditional use within the R-4 district. The majority of the City is zoned for one of these residential districts.

"It is desirable to allow houses of worship within the residential districts, rather then in the commercial or industrial districts. The restriction against houses of worship in the City's C-1 district is simply good planning practice. There is only one C-1 district in the City, that being the Journal Square Central Business District. Journal Square is the heart of the City. It is the City's commercial and retail center and, as such, its land values are among the highest in the City. Development should reflect the role Journal Square plays in the overall welfare. The Zoning Ordinance identifies the purpose of the C-1 (Journal Square) district as being 'to recognize the unique merging of mass transit facilities in Journal Square, the established commercial pattern, and the development intensity. The C-1 district expands the present Journal Square boundaries to encourage higher density residential and commercial uses around the mass transit facilities ... ' The establishment of a use that will primarily attract users on weekends does not fulfill the intensity of use desirable at the heart of the City nor does it recognize and take advantage of the tremendous mass transit facilities located herein. Further, there is limited benefit or contribution to the vitality of Journal Square from a use which will remain predominantly unused for the majority of the week. Such use will not provide the permanent employment opportunities or contributions to the existing retail establishments or return expected revenues to the City as one one would desire and expect from such a location."

The Board of Adjustment hearing was adjourned until August 16, 1984 to give citizen objectors time to obtain legal counsel. On that date there was testimony; the New Jersey Witnesses' attorney moved for an order requiring issuance of a permit; the matter was adjourned to September 20, 1984. The appeal was then dismissed. The plaintiffs in the present case point to N.J. S.A. 40:55D-73 which provides that: "(a) The Board of Adjustment shall render a decision not later than 120 days after the, (1) date an appeal is taken from the decision of an administrative officer ... " and "(b) failure of the Board to render a decision within such 120-day period or within such further time as may be consented to by the applicant, shall constitute a decision favorable to the applicant."

Based on these provisions plaintiffs claim that under the New Jersey law they are entitled to the issuance of the permit. The defendants have not yet responded satisfactorily to that contention.

In any event, while New Jersey Witnesses was proceeding with its application for a permit it filed other applications of a less extensive nature.

On May 21 and May 23, 1984, New Jersey Witnesses filed two construction permit applications, one for roofing and one for plumbing to replace the furnace. These applications were granted and permits were issued. The defendant Robert Shortell, Chief Construction Official of the City, believed these permits were authorized by Section 406D of the Zoning Ordinance, which provides:

"Such repairs and maintenance work as required to keep a structure in sound and safe condition may be made to a non-conforming structure containing a non-conforming use, providing the repairs and maintenance work do not change the use, expand the building or the functional use of the building or increase the non-conformity in any manner."

A non-conforming use is defined as "A use occupying a building, structure or lot

which does not conform to the use regulations of the district in which it is located."

As it now stands, the Stanley Theater is not a non-conforming use, since its use as a theater is unambiguously permitted in a C–1 zone. Only if it were actually being used as a house of worship would it be a non-conforming use, and that is the use which the City officials will not permit.

Thus Shortell's need to rely on Section 406D of the Zoning Ordinance relating to repairs of non-conforming uses is open to question, but that is not a critical issue at this juncture of the case.

On June 21, 1984 the plaintiffs filed three separate applications with the Building Department of the City of Jersey City. The first application was for a plumbing permit. The second application was for an electrical permit. The third permit application was to install a 400-ton air conditioning unit. These applications were accepted by the Building Department and treated as amendments to their plan which was filed on March 2, 1984. Shortell, the Chief Construction Official of the City, reasoned that he could not grant permits at that time because there was no prior approval by the Chief Zoning Officer of the City. He further reasoned that the plaintiffs had appealed Munley's decision and the matter was before the City's Board of Adjustment.

On July 11, 1984, the plaintiffs appealed the denial of the plumbing permit, the denial of the electrical permit, and the denial of the air conditioning permit to the Construction Board of Appeals. The Construction Board of Appeals declined to act on the appeal by the plaintiffs concluding that the requested permits involve the same subject matter as the appeal before the Board of Adjustment.

The testimony and other evidence at the hearing on plaintiffs' application for a preliminary injunction establish that the electrical wiring panels and switches throughout the building are very old, most of it dating back to 1928, when the theater was built. General deterioration and exposure to water has rendered some of the wiring and related equipment dangerous. There was testimony that there had been a fire in one electrical panel caused by water penetration.

The plumbing is also in a badly deteriorated condition. The pipes and valves are old and rusted. The toilet facilities are broken and leaking. It would be difficult to effect spot repairs, since disturbances of one portion of the plumbing would cause leaks and damage to other portions. Water damage is evident in the deterioration of the walls and ceilings.

There was a conflict in the testimony about how dangerous the electrical system is. Plaintiffs' architect testified as to a continuing danger of short circuits and fire. Jersey City's electrical sub-code officer minimized the danger, asserting that existing deficiencies could be cured by relatively minor steps such as covering open splice boxes, correcting drainage and the like.

The force of his testimony was weakened by the fact that the City has posted the premises with a notice that the wiring is not approved and by the fact that the pink slips detailing the violations set forth an extensive list of deficiencies.

I conclude that both the electrical and plumbing system are seriously deteriorated, that they are a continuing hazard and should be attended to promptly both as a safety measure and as a prudent step to prevent general decay of the property.

It is also apparent that the application for the electrical and plumbing permits called for equipment and capabilities which exceed significantly those needed for the mere replacement of existing equipment and capabilities. For example, there are shown on the plans submitted as a part of the permit application 20 electrical panels, of which 12 are new; stronger lighting is called for in some areas; substantially increased toilet facilities are provided. These additional items would constitute a step towards implementing the overall conversion plan which was before the Board of Adjustment.

There is nothing called for in the permit application which is not in strict conformity with applicable electrical or building codes, and all of the additional items would be completely lawful under the Zoning Ordinance were the building used for commercial theater and convention hall purposes.

It must be concluded that the overall construction work for which New Jersey Witnesses sought approval in its March 2nd application and the repairs, renovations and partial improvements for which it sought permits in June were lawful and permitted under the Zoning Ordinance and building codes were it not for the fact that it was intended that the structure be used in connection with religious activities.

It must also be concluded that apart from the religious nature of the activities which plaintiffs proposed to conduct in the restructured building, these activities were permitted uses in a C–1 zone.

The proposed use called for production of movies and shows. These activities clearly come within the permitted theater use. It was intended that there be large gatherings of people. This kind of activity clearly comes within permitted convention hall use. It was intended that there be several apartments within the building. The Zoning Ordinance permits medium and high-rise apartments, hotels and motels in a C–1 zone. It was also intended that food be served. The C–1 zone permits retail sales of goods and services and restaurants, night clubs and bars. Were there any question whether all of these uses could be contained under one roof, the ordinance resolves that doubt, stating, "More than one use may be designed in any building."

Thus, the basis for denying New Jersey Witnesses' March and June applications is simply that these otherwise permitted uses will be conducted as part of the ongoing activities of a religious organization in the course of teaching, observing and propagating its faith.

This raises the substantive question whether a municipality may, consistent with the First Amendment of the United States Constitution, create a commercial zone and prohibit the use of a structure within the zone by a religious organization, the activities of which would otherwise be permitted by the Zoning Ordinance.

### III.  Conclusions of Law.

The Court has jurisdiction of this case under 28 U.S.C. Section 1331 and 28 U.S.C. Section 1343. The action is brought pursuant to 42 U.S.C. Section 1983 against defendants acting under color of state law.

The initial question which must be faced is whether I should abstain. Proceedings before a Board of Adjustment do not qualify as a judicial proceeding, and, therefore, *Younger* abstention is inappropriate. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); compare *Middlesex Ethics Committee v. Garden State Bar Association,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).

Proceedings before a Board of Adjustment are not the kind of complex state regulation which would call for a *Burford* abstention. *Burford v. Sun Oil Company,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

My original reaction to this case was that there might be unsettled questions of state law; namely, the meaning of the Zoning Ordinance and that, therefore, *Pullman* abstention would be called for. *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); see also *England v. Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

It is the defendants' contention that the use to which plaintiff proposed to put the Stanley Theater would render it a house of worship as defined in the ordinance. Use of a structure as a house of worship is not permitted in a C–1 zone and consequently under the terms of Section 104 of the Ordinance, such use is prohibited in that zone.

New Jersey Witnesses would be required to obtain a certificate of occupancy before use of the theater, and if the theater were to be used as a house of worship, application of Sections 801 and 803 of the Zoning Ordinance would require that the Superin-

tendent of Buildings refuse to grant such a certificate.

As to building permits, as distinguished from certificates of occupancy, Section 801 provides that "[i]n no case shall a building permit be issued for the ... alteration of any structure ... until the proposed ... alteration conforms to the provisions of this ordinance."

The defendants have taken the position in this case that the alterations sought in New Jersey Witnesses' March and June applications do not conform to the provisions of the ordinance because it was intended to put them to a use not permitted under the ordinance. This position was taken even though the very same alterations would be permitted if it were intended to continue the Stanley Theater's use as a commercial theater and convention hall.

In any event, defendants have taken the unambiguous position that the Stanley Theater as plaintiffs propose to use it is a house of worship and thus forbidden in the C–1 zone.

Plaintiffs advance the argument, which is not totally implausible, that the proposed use of the Stanley Theater does not convert it into a house of worship as defined by the Zoning Ordinance. Houses of worship are permitted in residential zones. They are defined as buildings for the assembly of members of a designated faith for religious instruction and worship of a deity. The definition contains examples, namely, a church, synagogue or temple. These examples suggest the kinds of structures which would be deemed houses of worship, each of which would be compatible with nearby residential use. A structure such as the Stanley Theater is not like the typical church, synagogue or temple. It would hardly be compatible with the neighboring residential use. If one were to accept defendants' interpretation of the ordinance, that the Stanley Theater as plaintiffs propose to use it is a house of worship, one might conclude that the Zoning Ordinance would permit a building having a 4,000-person capacity to be erected in any of Jersey City's residential zones.

While present building regulations might prevent the construction of a Stanley Theater in residential districts, the defendants point to other structures of a different design which have been built in residential districts and which can accommodate thousands of persons in convention-like conclaves.

While the defendants' interpretation of the ordinance seems eminently reasonable, plaintiffs' contentions raise the possibility at least that defendants' interpretation may not be the last word on the subject. That being the case, it might well be that a *Pullman* abstention will be in order before proceeding to a final hearing.

In the present posture of the case, however, I do not think *Pullman* abstention is justified. Plaintiffs seek very limited injunctive relief, namely, the issuance of permits to enable them to effect repairs and maintenance required to eliminate safety hazards and to preserve from deterioration and possible total loss a facility which they need to carry on various of their religious activities. Similar constitutional issues will have to be faced whether the Zoning Ordinance is interpreted to forbid plaintiffs' use of the building because it is a house of worship or whether the Zoning Ordinance is interpreted to forbid plaintiffs' use of the building not because it is a house of worship but because plaintiffs' use is of a religious nature.

Of course, if the municipal body or a State Court should conclude that the theater as used by the plaintiffs is not a house of worship and that plaintiffs may use it as they propose, the constitutional issues will be moot. However, if, in the meantime, plaintiffs' religious liberties are being infringed, this Court would have the obligation to provide protection pending a decision by the Board of Adjustment or the New Jersey Courts. *New Jersey-Philadelphia, etc., v. New Jersey State Board,* 654 F.2d 868, 885–886 (3d Cir.1981).

When passing upon an application for preliminary injunctive relief a court must consider (i) the probability of the mov-

ing party ultimately prevailing on the merits, (ii) the likelihood of irreparable injury absent such relief, (iii) the harm to the non-moving party and third parties if relief were granted and, (iv) if relevant, the possibility of harm to the public, e.g., *Delaware River Port Authority v. TransAmerican Trailer Transport, Inc.,* 501 F.2d 917 (3d Cir.1974).

The last three factors require only limited discussion. Plaintiffs are threatened with irreparable injury if the requested relief is denied. High in the pantheon of civil rights guaranteed by the United States Constitution is the right to be free of laws prohibiting the free exercise of religion or abridging freedom of speech. The degree of protection to which these rights are protected is spelled out in detail in *Wisconsin v. Yoder,* 406 U.S. 205 (1972). Here plaintiffs seek to practice, teach and proclaim their religious beliefs using a facility they consider to be well adapted to that purpose. The Zoning Ordinance, as implemented by municipal officials, prohibits them from doing so. Absent a compelling state interest in this particular land use regulation, plaintiffs would be unlawfully deprived of an important liberty interest, a deprivation which constitutes irreparable injury.

Granting the limited relief plaintiffs now seek would in no way harm the defendants. Were the New Jersey Witnesses allowed to effect the intermediate electrical and plumbing repairs and improvements sought in the June applications, neither defendants nor third parties would be harmed in any way. The repairs and improvements do not convert the building itself to a non-conforming use. It remains a theater capable of use as a theater. The only differences are that deteriorated and dangerous equipment and materials are replaced with new conforming and safe equipment and materials, and additional electrical capabilities and plumbing fixtures will be installed. The risk lies with plaintiffs in that if they are wrong in their legal conclusions, they may never be permitted to use the theater for religious purposes and their expendi-

tures for repairs may have been for naught.

Insofar as third parties and the public are concerned, it is in their interest that the repairs and renovations be made as soon as possible. The existing hazards are a continuing danger to the public and their removal would remove a threat to property and person.

Disposition of plaintiffs' application for preliminary injunctive relief must turn, therefore, on a consideration of plaintiffs' likelihood of succeeding on the merits.

Jehovah's Witnesses' practice of gathering in large groups for religious instruction and worship is in performance of their religious beliefs. This practice is protected by the First Amendment's free exercise clause made applicable to the states by the 14th Amendment. Indisputably, application of Jersey City's Zoning Ordinance prevents plaintiffs from freely exercising their religious beliefs. It is equally indisputable that not every governmental interference with religious practices is unconstitutional.

The permissible bounds of municipal zoning ordinances are set forth in *Schad v. Mt. Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). The Court stated:

"Where property interests are adversely affected by zoning, the courts generally have emphasized the breadth of municipal power to control land use and have sustained the regulation if it is rationally related to legitimate state concerns and does not deprive the owner of economically viable use of his property." At page 68, 101 S.Ct. at page 2182.

However, the present case does not involve property interests. It involves important First Amendment rights. As to such rights the Supreme Court ruled:

"... when a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest." At page 68, 101 S.Ct. at page 2182.

In such a case "the Court must not only assess the substantiality of the governmental interests asserted but also determine whether those interests could be served by means that would be less instrusive on activity protected by the First Amendment." *Ibid* at page 70, 101 S.Ct. at page 2183.

Applying these criteria here, I conclude that plaintiffs are likely to establish at a final hearing that Jersey City's interpretation and application of its Zoning Ordinance unconstitutionally infringes plaintiffs' religious liberty interests in that such enforcement is not rationally related to legitimate state concerns and does not serve a substantial governmental interest.

There may well be circumstances in which a compelling public interest would justify prohibiting church construction in a particular zone. Perhaps such use would be incompatible with residential use in some situations, *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc., v. City of Lakewood*, 699 F.2d 303 (6th Cir. 1983), but see *Diocese of Rochester v. Planning Board*, 1 N.Y.2d 508, 136 N.E.2d 827, 154 N.Y.S.2d 849 (1956). Perhaps the danger to worshipers would be so great in a heavy industry zone that there would be a compelling state interest in preventing construction of houses of worship there. However, in the present case there is no factor of zoning significance which justifies prohibiting plaintiffs' proposed use of the Stanley Theater. The proposed physical appearance and physical structure of the theater is permitted by existing ordinance. Every use contemplated by plaintiffs is a use which the Zoning Ordinance would permit a commercial enterprise to engage in. The goal of Jersey City's master plan is to draw people from a wide area to the Journal Square area using the existing transportation facilities and providing customers for local merchants and other businesses. Plaintiffs' proposed use of the theater contributes to this goal. Not only persons from Jersey City but also people from surrounding areas would be drawn to the facility. They would undoubtedly make use of public transportation which serves Journal Square and they would undoubtedly patronize local merchants, hotels and other facilities while they were there. The fact that their presence was religiously rather than secularly motivated would seem to have absolutely no significance for zoning purposes.

While defendants' plans to rejuvenate the Journal Square area represents a compelling public interest, there is nothing to show that plaintiffs' proposed use of the theater would in any way interfere with implementation of the plan. Defendants suggest two reasons why allowing the use of the Stanley Theater for religious purposes would cause such interference.

First, the plaintiffs' use of the building would prevent acquisition of the site for an office building, high-rise apartment or other commercial use. However, there has been no showing either that there are no available sites in the C–1 zone for such uses or that any potential developer is unable or unwilling to proceed with the project in the C–1 zone by reason of plaintiffs' proposed use of the theater. Second, defendants assert the City will lose real estate taxes if the theater were converted to religious uses. This may be true, but it is questionable whether this is a proper zoning reason to forbid religious use of property. Further, even if it were to be considered there surely are other means to build the City's tax base so as to avoid impinging on activity protected by the First Amendment.

Generally, the cases upon which defendants rely support the imposition of reasonable regulations on the use of land and buildings by religious bodies, *e.g., First Assembly of God against the City of Alexandria, Virginia*, 739 F.2d 942 (4th Cir. 1984.) That is a far cry from absolute prohibition of religious use in a given zone, *cf., St. John's Evangelical Lutheran Church v. Hoboken*, 195 N.J.Super. 414, 479 A.2d 935 (Law Div.1983).

On the basis of the evidence before me now, I conclude that it is unlikely that defendants will be able to meet either stan-

dard for evaluating a zoning ordinance. Plaintiffs' proposed use of the theater being precisely the kind of use contemplated in a C–1 zone, to forbid such use is not rationally related to legitimate municipal zoning concern. A fortiori forbidding plaintiffs' proposed religious use of the theater serves no substantial government interest. For a suggested different method of analysis leading, I believe, to the same result which I have reached in this case, see Note, *Land Use Regulation and the Free Exercise Clause*, 84 Col.L.Rev. 1562 (1984).

Plaintiffs urge that *Schad* suggests one further reason why plaintiffs are likely to prevail on the merits. The Zoning Ordinance under review in that case was found to be defective because it did not permit live entertainment, a form of expression protected by the First Amendment, in any part of the borough. Plaintiffs argue that in the present case the effect of Jersey City's interpretation of its Zoning Ordinance is to preclude Jehovah's Witnesses from conducting anywhere in the City circuit assemblies, a form of exercise of religion protected by the First Amendment.

The City authorities have ruled that the Stanley Theater, which was designed to accommodate gatherings of that size, may not be so used because buildings used for religious purposes are not allowed in any zone other than a residential zone. Further, it appears that the applicable ordinances would not permit a structure such as the Stanley Theater to be built and used in a residential zone. From this plaintiffs argue that there is no place in Jersey City where plaintiffs can acquire or erect a building in which they can carry on the religious activities proposed for the Stanley Theater. I do not believe that this argument is tenable. Even though a building having the physical configuration of the Stanley Theater could not be built in a residential zone, it appears that differently designed buildings in which plaintiffs' assemblies could be conducted may lawfully be built in residential zones under applicable ordinances.

Having concluded, however, that the plaintiffs have met the requirements for preliminary injunctive relief, an order will be entered requiring the plumbing and electrical permits be issued for the work described in the applications which the New Jersey Witnesses filed on June 21, 1984.

Plaintiffs seek no further relief at this time and I believe no further relief is appropriate now. If any party is of a view that any pending motions retain vitality in spite of today's rulings, the party may set such motion for hearing on the November 13th regular motion day.

Except for such motions, further proceedings in the action will be stayed on *Pullman* principles. This will give the Jersey City Board of Adjustment and the New Jersey courts an opportunity to determine the effect of the Board's failure to rule on plaintiffs' application to it and to construe the applicable provisions of the Jersey City Zoning Ordinance. Upon resolution of any viable pending motions the action will be administratively terminated with the right of any party to move to reopen for good cause.